IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PAUL GODERTH, | ) |
| Petitioner, | ) No. 24-cv-8211 |
| v. | ) Judge Jeffrey I. Cummings |
| LEILANI YANDALL-GODERTH, | ) |
| Respondent. | ) |

**MEMORANDUM OPINION AND ORDER**

On September 9, 2024, petitioner Paul Goderth ("Petitioner or "Paul") filed a petition against Respondent Leilani Yandall-Goderth ("Respondent" or "Leilani") for the return of the parties' two minor children to Germany under the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (Oct. 25, 1980) (the "Convention"), so that the question of custodial rights and the children's place of abode can be finally resolved in Germany. Leilani opposes Paul's petition and seeks to have the issues of the children's custody and abode resolved in the United States.

To begin, the Court notes that it is clear that both parents love the children dearly, and they both believe that they are acting in the children's best interests. The Court further notes that its duty under the Convention does not extend to determining Paul and Leilani's respective custodial rights. Instead, the Court's task is limited to determining whether the issues of the children's custody and abode will be determined in Germany or the United States. To this end, the Court held an evidentiary hearing on February 19 and February 28, 2025, at which the parties presented witness testimony and documentary evidence. The parties also filed post-hearing

briefs. (Dckt. ##56, 57). For the reasons set forth below, the Court denies Paul's petition for the return of the minor children to Germany.

I.     **STANDARD OF DECISION**

Where, as here, an action is "tried on the facts without a jury," Federal Rule of Civil Procedure 52 requires the Court to "find the facts specially and state its conclusions of law separately." Fed.R.Civ.P. 52(a); *see also Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012) ("the trier of fact must decide whom to believe (and how much to believe) on the basis of coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues [as] to falsity and veracity."). In doing so, "[t]he Court must explain the grounds" of its decision and otherwise demonstrate a "'reasoned, articulate adjudication.'" *Torres v. Tovar*, No. 22-CV-3806, 2023 WL 5431352, at *1 (N.D.Ill. Aug. 23, 2023), *quoting Aprin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008).

In adjudicating Paul's petition, the Court has carefully considered the parties' submissions, the applicable caselaw, the totality of the admissible evidence presented at the hearing, and the weight to be accorded that evidence, including each witness's credibility. In assessing witness credibility, the Court observed and considered, among other things, "each witness' demeanor and facial expressions; intelligence; ability and opportunity to see, hear, or know the matters about which the witness testified; memory; potential for bias; and the believability of the witness' testimony considering the other evidence presented." *Torres*, 2023 WL 5431352 at *1.

The following represents the Court's findings of fact and conclusions of law as required by Rule 52.

## II. FINDINGS OF FACT

### A. The Children's Lives in Germany

Paul, a German citizen, married Leilani, a U.S. citizen, on October 31, 2014, in Germany. (Joint Exhibit ("JX") No. 13). During their marriage, they welcomed two children, a daughter in March 2015 and a son in December 2016.[1] (JX Nos. 4–5). The children resided in Germany in the same family home from birth until August 2023. (Dckt. #50 (2/19/25 Hr'g Tr.) at 16–17). Leilani's three older children from a prior relationship also lived in the family home during that time. (*Id*. at 35). While living in Germany, the children spent time with family and friends, had regular medical providers and insurance coverage, attended school, and participated in extracurricular activities, including ballet and gymnastics for the daughter. and soccer for the son. (*Id*. at 25–29). The children also maintained both German and U.S. passports. (JX Nos. 6–9).

During their time in Germany, Leilani (and sometimes Paul) traveled with the children once or twice a year to the U.S. to visit Leilani's family in the Chicagoland area. (Dckt. #50 at 18; Dckt. #52 (2/28/25 Hr'g Tr.) at 5–6). Paul testified that when Leilani traveled without him, she traveled with an executed "Consent for a child traveling with his mother" form, which was signed by both parents and included the dates and location of travel. (Dckt. #50 at 38; Petitioner's Exhibit ("PX") Nos. 23–24).

In May 2022, Paul moved to a separate apartment located in the basement area of the family home, while Leilani and the children continued to live on the main floor. (Dckt. #50 at 23). From May 2022 through August 2023, Paul continued to spend time with the children. (*Id*.

---

[1] The minor children share the same initials, so the Court refers to them as simply the "daughter" or the "son," and collectively, the "children."

3

at 24). Although there was no set schedule for visitation, Paul testified to seeing and speaking to the children every "two to five days," including, at a minimum, "on every second weekend," and "during the week sometimes they came downstairs." (*Id*. at 23–24, 31). Paul and the children enjoyed going to "fun parks," biking, and visiting family. (*Id*. at 29).

While Paul was living in the basement—and at all relevant time periods—Paul and Leilani communicated primarily using the "WhatsApp" messaging service. (*Id*. at 24–25, 30). The translated WhatsApp messages from January 2023 through August 2023 reflect that Paul and Leilani regularly communicated in a pleasant manner regarding the children's day-to-day activities and well-being, as well as what occurred when Paul would see the children. (JX No. 10).

Paul filed a petition for divorce in the German court on April 27, 2023. (Dckt. #50 at 23). Around that same time, Paul and Leilani agreed that Leilani would travel with all of her children to the U.S. to visit her family in late August 2023. (*Id*. at 136). To this end, on May 2, 2023, Leilani booked round trip tickets from Stuttgart, Germany to Chicago, Illinois from August 22, 2023 to September 10, 2023, in order to land in Stuttgart on September 11, prior to the September 13 school start date in Germany. (Dckt. #50 at 44–45, 136–37).

Leilani testified that in either May or June of 2023, she provided Paul with consent to travel forms for their shared children reflecting the then-agreed-upon vacation dates from Stuttgart to Chicago on August 22, 2022, with a return date of September 10, 2023. (Dckt. #50 at 134–36; PX Nos. 23–24). According to Leilani, Paul never returned the forms to her. (Dckt. #50 at 135). Paul, on the other hand, testified that Leilani gave him the prefilled consent forms a few days before the August 22 flight, as reflected by his signature on the forms that he signed and dated on August 19, 2023. (*Id*. at 38; PX. Nos. 23–24).

4

### B. The July 18, 2023 Conversation and the Parties' Conduct Thereafter

On July 18, 2023—about a month before the trip—Leilani and Paul went on a walk without the children "to discuss moving" to the U.S. because they had "talked about it before." (Dckt. #52 at 8). According to Leilani, it was during this walk that Paul suggested, "Why don't we try—how about you and the kids move [to the U.S.] for a year, see how it goes?" (*Id*. at 9). They discussed child support and logistics, including that Leilani would live with her parents for a year. (*Id*.). Leilani testified that she even suggested to Paul that he consider moving to the U.S., to which Paul responded that there was a "job opportunity in Columbus [North Carolina]" that he could possibly take. (*Id*. at 10). Based on this conversation, it was Leilani's understanding that Paul agreed to her moving to the U.S. for a year. (*Id*. at 10–11).

For his part, Paul recalled taking the walk with Leilani in July 2023, but denied consenting to Leilani moving the children to the U.S. for a year. (*Id*. at 193). Instead, Paul testified that Leilani *suggested* she move the children to the U.S. for a year, however he did not agree because he wanted to see his "children grow up" and it would be "unacceptable" if he only saw them once or twice a year. (*Id*. at 194).

Notwithstanding the parties' conflicting understandings of the July 2023 discussion, it is clear from the record that immediately thereafter Leilani started taking steps to effectuate what she believed to be an agreed upon move to the U.S. with her children. To begin, Leilani testified that she and Paul returned to the house after the walk and told the children "right away" about the move, (*id*. at 11–13), though Paul denied being present for that conversation, (*id*. at 194). Moreover, the next day, July 19, 2023, Leilani had the following text exchange on a group chat with her U.S.-based family members:

5

| | |
|---|---|
| **Leilani:** | Fam I had a long conversation with Paul yesterday—you guys all know I believe in the power of love do it all with love for love in love—your imagination is key your Energ[y] your feeling be kind to yourself and others[.] It went better then I imagined . . . and it shall be[.] Still have a few details to work out but with love all is possible so we should be home running on Aug 22[.] |
| **Austin:** | One way? |
| **Leilani:** | As of right now yes. |

(Respondent's Exhibit ("RX") No. 51). Both Leilani and her mother Connie testified that Leilani's message and her use of "home running" meant that Leilani and the children were moving back to the U.S. (Dckt. #52 at 14, 174–75).

Leilani also shared the news of her upcoming move to the U.S. with her friends and family in Germany, which is corroborated by Leilani's social media posts from August 2023. For example, on August 12, 2023, Leilani posted a picture of a surprise going away party her friends threw at Leilani's home. (*Id*. at 17–19; RX No. 45). A few days later, Leilani posted pictures of her and a friend who came over to help pack, which included the text: "Thank you for helping me get a move on." (Dckt. #52 at 20-21; RX No. 44). On August 20, 2023, Leilani posted a picture of various going away presents her friends had brought for her and her children that were displayed on the dining room table of the home. (Dckt. #52 at 24–28; RX No. 41).

Leilani's cousin Ulri stayed overnight at the house to help pack in the six to seven days leading up to the August 22 flight, including the night before. (Dckt. #52 at 32–33; 146–47). According to Ulri, she would not normally spend the night at Leilani's house but did so on this occasion to spend more time with the family before they left for the U.S. (*Id*. at 146–47). Leilani testified that Paul was present while Leilani and the children packed clothes, certain toys, and important paperwork for the children to enroll them in school. (*Id*. at 33–36). Ulri also testified that Paul "definitely" saw them packing and "didn't say anything about it," so for her "it

6

was pretty clear that he must have known" Leilani and the children were moving. (*Id*. at 150–51). Another family friend, and both of Leilani's older sons' girlfriends, also stayed overnight on August 21. (*Id*. at 52).

According to Leilani, Paul never questioned her about her social media posts, the numerous people coming and going from the house in August 2023, the presents spread out on the dining table (which he would have had to see when he came upstairs to use the house's full kitchen), or her extensive packing. (Dckt. #52 at 28, 31–33). Paul, however, testified that: (1) he was "no longer interested" in Leilani's social media posts after their separation; (2) he did not see the presents on the dining room table because he claims he was locked out of Leilani's part of the house in August 2023; and (3) although he originally testified he did not see Ulri leading up to the August 22 flight, on cross-examination he admitted that he "might" have seen her briefly. (*Id*. at 196–97, 216–17).

### C. Leilani and the Children's Move to the U.S.

On August 22, 2023, Leilani and her children traveled with Ulri and some of the older children's friends in three cars to the airport for the flight to Chicago. (Dckt. #52 at 36). Leilani did not recall seeing Paul at the house when they left for the airport. (*Id*.). On August 24, 2023, two days after arriving in the U.S., Leilani enrolled the children in the local elementary school, which had resumed classes on August 16, 2023. (*Id*. at 37; PX No. 30; RX No. 50). The enrollment paperwork indicates that the children "moved from Germany" and reflects that their first day of school in the U.S. was on August 29, 2023. (RX No. 50).

On their first day of school, the children received Chromebooks, which Leilani testified that they were "so excited about" because they had not previously used computers. (Dckt. #52 at 38–40). Leilani testified that on either August 29, 2023 or August 30, 2023, the children spoke

7

with Paul and told him about their first day of school and their new Chromebooks. (*Id*. at 39–40). Leilani explained that when the term "Chromebook" didn't translate to Paul during this conversation, the daughter used a German accent to explain that "It's a computer, computer." (*Id*. at 40). The timing and nature of this conversation was corroborated by Leilani's mother Connie, who overheard the exchange and was particularly credible in the Court's eyes. (*Id*. at 180 ("I heard especially [the daughter] was very excited to tell him that she got a computer. She tried to tell him that in German, and it just kind of sounded kind of funny.")). Connie agreed that the call occurred on either the first or second day of school. (*Id.* at 189). Although Paul initially denied having any calls with the children while they were in the U.S. during late August/early September, he later recalled having a short conversation with the children during their first week in the U.S. (*Id*. at 195). However, he denied that they told him about starting school or the Chromebooks, and instead testified that it was Leilani who mentioned to him at the end of September that the children had received Chromebooks at school. (*Id*. at 195, 211).

    The WhatsApp text thread between August 22, 2023 and September 10, 2023 does not reflect any completed phone calls between Leilani and Paul as it does on later dates. (*See, e.g.*, JX No. 10 at 335 (reflecting a nineteen-minute video call on 11/22/23)). As a result, Paul asks the Court to conclude that he did not speak to the children at any time between August 22 and September 10, 2023. However, Paul himself testified to participating in at least one call with the children during this time period, as did Leilani and Connie. Moreover, given Paul's expressed loved for his children, the Court finds it overwhelmingly likely that Paul did, in fact, speak with the children during this time frame. As such, the Court finds, as Leilani testified, that the WhatsApp thread simply did not capture and reflect completed calls at that time.

8

Furthermore, the following facts in the two paragraphs below: (1) undermine Paul's assertion that he expected Leilani and the children to return to Germany on September 11, 2023; and (2) support Leilani's argument that Paul knew prior to September 10, 2023 that she would *not* be returning to Germany with the children on the previously booked September 10 return flight.

In particular, between August 28 and September 1, 2023, Leilani and Paul exchanged texts on WhatsApp about, *inter alia*, cleaning out the fish aquarium and the garbage can in Leilani's portion of the house in Germany, and—on September 1—Leilani asked Paul if he could look for one of her older son's report cards at the house. (JX 10 at 324–25). However, there are *no* text messages between Leilani and Paul on the WhatsApp thread between mid-day on September 3 and September 10, 2023, the date of Leilani and the children's originally scheduled flight from Chicago back to Germany. Indeed, Paul did not tell Leilani that he was looking forward to seeing the children; did not wish them a good flight (as he recently did on two other occasions when Leilani traveled out of the country with the children); and did not ask Leilani if they needed a ride from the airport. (*Id.* at 309, 324 (wishing Leilani a "good flight" on June 15 and August 22, 2023)). This *lack* of communication leading up to his children's purported return flight to Stuttgart is in direct contrast to Paul's conduct in July 2023 when the children traveled out of the country with Leilani to visit family. In the days leading up to *that* return flight, Paul asked Leilani, "When will you land in Stuttgart? I can pick you up . . ." (*Id.* at 315).

Furthermore, there is no evidence in the record that Paul took any action to contact Leilani on September 10 or September 11 to ascertain whether she had returned with the children to Germany on the pre-booked flight and, if not, why she had not returned. Nor did Paul offer any evidence that he checked with the airline to ascertain whether Leilani and the children had

9

returned on the flight. Instead, the record shows that the next attempted contact between the parties was on September 11, 2023, when Leilani texted Paul, "Hey," "Do you have time to talk?" (*Id*. at 326). Paul did not respond via WhatsApp at all, let alone ask why Leilani had not yet returned home with his children. Instead, Paul texted Leilani two days later on September 13, 2023, asking simply, "Hey is [the son] there? I'm at home . . ." (*Id*.). Again, Paul did not inquire why Leilani had not returned to Germany with the children on the pre-booked flight.

### D. Paul's Legal Actions to Assert His Custody Rights

On September 28, 2023, Paul initiated a case in German family court against Leilani to "get her to bring the children back to Germany." (Dckt. #50 at 51). The German court held a hearing in October 2023, at which Leilani did not appear but participated through counsel. (JX 11 at 383–93). On January 11, 2024, the German court entered a judgment, declaring that Leilani improperly retained the children in the U.S. without Paul's consent and temporarily transferred the right to determine the place of abode for the children to Paul. (*Id*.). Paul also initiated a criminal proceeding in Germany against Leilani for child abduction. (*Id*. at 386).

In June 2024, Paul's attorney in Germany caused a request for return of Paul's children under the Convention to be issued to the U.S. Department of State. (JX 11 at 349–50). On August 23, 2024, Paul filed a "Petition to Enroll a Foreign Judgment/Decree," in the Circuit Court of Lake County, Illinois seeking to enforce the German Court's judgment in his favor. (JX No. 12). Paul filed his petition in this Court shortly thereafter on September 9, 2024. (Dckt. #1).

### E. Life for the Children in the U.S.

After their arrival, the children quickly became acclimated to life in the U.S. Among other things, the daughter participates in competitive cheerleading, tumbling, and swimming, and the son participates in jujitsu and basketball. (Dckt. #52 at 44–46, 66). The children live with

10

their mother and their grandparents (Leilani's parents), and they spend time with their immediate and extended family in the Chicagoland area, including at large holiday celebrations. The children have many friends at school, in their neighborhood, and in their extracurricular activities. (*Id.* at 46, 62–63, 179, 186–87).

The children attend school regularly and their grades and state test scores range from below-to-above average depending on the topic or behavioral metric. (RX Nos. 25–30, 48–50). The daughter's fourth grade teacher testified at the hearing that she speaks, reads, and writes in English, is "always happy" to be at school, interacts appropriately with other students, and reads and performs math at a fourth-grade level. (Dckt. #52 at 161–62). The son has been enrolled in English Language ("EL") services at school since he started in August 2022 and also participates in a mentoring program for additional support. (*Id.* at 94, 165). His EL teacher testified that he is "absolutely" fluent in English, participates fully in class with his peers, works hard, and is a "normal second grader." (Dckt. #52 at 165–66). As for Leilani, she began working in the U.S. on September 5, 2023, as a state-compensated caretaker for her niece, and later took a job as an aide in the Wauconda School District. (*Id.* at 51, 54–55).

### III. CONCLUSIONS OF LAW

The Convention, to which both the U.S. and Germany are signatories, is designed "to address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (cleaned up). However, "[a] Hague Convention case is not a child custody dispute." *Baz v. Patterson*, 100 F.4th 854, 865 (7th Cir. 2024), *quoting Redmond*, 724 F.3d at 737. "Rather, the purpose of a Convention case is to determine whether a child has been wrongfully removed or retained from his [or her] habitual residence and, if so, to order the child's prompt return." *Baz*, 100 F.4th at 865.

11

"Article 12 of the Convention states the general rule that when a court receives a petition for return within one year after the child's wrongful removal, the court 'shall order the return of the child forthwith.'" *Lozano v. Montoya Alvarez*, 572 U.S. 1, 5 (2014) (citing *Abbott v. Abbott*, 560 U.S. 1, 9 (2010)). If, however, "the court receives a petition 'after the expiration of the period of one year from the date of the wrongful removal,' the court must order the return of the child '*unless it is demonstrated that the child is now settled in its new environment*.'" *Nolla v. Vargas*, No. 22-CV-1224-PP, 2024 WL 2976749, at *14 (E.D.Wis. June 13, 2024) (emphasis added) (citing *Lozano*, 572 U.S. at 5); *see also Fernandez v. Bailey*, 909 F.3d 353, 359 (11th Cir. 2018) (noting that "[t]he Convention treats petitions filed in the first year differently from those filed more than one year after a child is removed").

In the U.S., the Convention is implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §9001 *et seq*. Under ICARA, the petitioner—here, Paul—has the burden of making a *prima facie* showing by a preponderance of the evidence that his children were wrongfully removed or retained away from their habitual residence. 22 U.S.C. §9003(e)(1); *Baz*, 100 F.4th at 865. The Seventh Circuit has articulated a four-factor inquiry to determine whether a petitioner has stated such a *prima facie* case:

> (1) When did the removal or retention of the child occur? (2) In what State was the child habitually resident immediately prior to the removal or retention? (3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence? and (4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention.

*Baz*, 100 F.4th at 865–66, *quoting Redmond*, 724 F.3d at 737–38. The Court addresses each of these four questions in turn below.

### A. The Date of Retention

Paul maintains that the date of retention here for purposes of the Convention is September 10, 2023, when Leilani failed to board the return flight with the children from Chicago to Stuttgart as——according to Paul—the parties agreed she would do. In Paul's view, his September 9, 2024 petition in this Court was filed within one year (though just barely) of the wrongful retention and requires the return of the children to Germany under the Convention "forthwith." *See Nolla*, 2024 WL 2976749, at *15 (noting that for a petitioner to "benefit from Article 12's—for lack of a better word—'presumption' of return, the unlawful removal would have had to take place" within the year prior to the filing of the petition). In response, Leilani denies that she wrongfully retained the children (because, in her view, she had Paul's consent) but otherwise expresses confusion regarding any alleged wrongful retention date.[2]

"Wrongful retentions typically occur when a parent takes a child abroad promising to return with the child and then reneges on that promise." *Redmond*, 724 F.3d at 739 n.5. The date of such a retention can be either "the date consent was revoked" or "when the petitioning parent learned the true nature of the situation." *Baz v. Patterson*, No. 23 C 5017, 2023 WL 8622056, at *5 (N.D.Ill. Dec. 13, 2023) (citing *Abou-Haidar v. Sanin Vazquez*, 945 F.3d 1208, 1216 (D.C. Cir. 2019)). Based on the findings of fact outlined above, the Court concludes that the date of

---

[2] This confusion is understandable given Paul's changing position in his various legal proceedings. For example, in the petition to enforce filed in Lake County, Paul stated that he "did not give his consent for the children to be *removed* to the [U.S.] from Germany at any time prior to or after the entry" of the German court's January 2024 judgment. (JX No. 12) (emphasis added). In his accompanying motion to enforce filed in Lake County, Paul stated that Leilani wrongfully removed the children "on or about August of 2023." (JX No. 13). Then, in his petition in this case, he states that the wrongful *retention* is September 10, 2023. (Dckt. #1). In any event, Paul has continued to take the position in this case that the children were wrongfully *retained* in the U.S., and the Court proceeds accordingly to determine the actual date of that retention.

13

Leilani's retention of the children for purposes of the analysis under the Convention was no later than August 30, 2023.

To begin, even giving Paul the benefit of the doubt that he: (1) never consented to the one-year move; (2) did not observe Leilani's social media posts, the going away festivities at the house, or the extensive packing leading up to the trip; and (3) failed to grasp the significance of Leilani's September 1 request that he locate one of her older son's report cards,[3] the Court finds that he "learned the true nature of the situation" no later than when the children called him after their first day of school to share their excitement about their new Chromebooks. Once Paul learned that the children were enrolled in school in the U.S., he most certainly knew that they would not be returning to Germany two weeks later on the previously booked flight. And, again, the Court finds Leilani and her mother Connie's testimony regarding the timing and nature of this conversation to be particularly credible and rejects Paul's denial of the same.

The Court further finds that Paul's testimony that he learned about the Chromebooks from Leilani (and not the children) in late September 9 (and not right after they started school in late August) is not credible. Paul admitted that he spoke to the children during their first week in the U.S. and the Court finds that children who received their very first computer at school would most likely mention that fact to both of their parents at the first opportunity. On the other hand, there is no apparent reason why Leilani would have told Paul about the Chromebooks a month after the children started school.

Finally, Paul's assertion that the wrongful retention date was September 10, 2023 defies logic and common sense on the instant record. Again, as outlined above, Paul did not send

---

[3] This would be an odd request for Leilani to make if she were planning to return to Germany with the children nine days later. On the other hand, this request would make sense if Leilani were planning to remain in the U.S. with the children and enroll them in school here.

14

Leilani any messages in the days leading up to the originally scheduled return flight (as he did in advance of other recent flights). More importantly, Paul's utter and complete lack of response or expression of concern when Leilani did not land in Germany with his children on September 11, 2023, or in the days thereafter, fully undermines his position.

For these reasons, the Court finds that the date of retention was no later than August 30, 2023 and Paul did not file his petition within one year of that date.[4] This finding, however, "has no impact on whether [Paul] has proven his *prima facie* case. It only opens the door to [Leilani's] well-settled defense in the event that the court determines that [Paul] has made a *prima facie* case." *Nolla*, 2024 WL 2976749, at *17. As such, the Court proceeds to assess the remaining factors.

### B. The Habitual Residence of the Children

Next, the Court must determine the children's "habitual residence immediately before the alleged . . . retention." *Baz*, 100 F4th at 866 (cleaned up). Although the Convention does not define the term "habitual residence," the Supreme Court recently offered some clarification in *Monasky v. Taglieri*, 589 U.S. 68 (2020). In *Monasky*, the Court expressly rejected the view "that habitual residence depends on an actual agreement between a child's parents." *Id.* at 77. Instead, "[t]he place where a child is at home, at the time of . . . retention, ranks as the child's habitual residence." *Id.* As the Seventh Circuit more recently confirmed based on *Monasky*:

> Determining where a child was at home at the time of retention is a fact-driven inquiry, not a categorical one. The inquiry must be sensitive to the unique circumstances of the case and informed by common sense. Among the factors to consider are facts indicating acclimatization, which will be highly relevant, and the intentions and circumstances of caregiving parents. But no single fact . . . is

---

[4] The Court acknowledges that Leilani and Connie were not certain whether the Chromebook conversation took place on August 29, 2023 (the first day of school) or August 30, 2023 (the second day of school). This is of no moment because Paul's September 9, 2023 petition was not filed within a year of either date.

>dispositive across all cases, and so courts must consider the totality of the circumstances specific to the case to determine a child's habitual residence.

*Baz*, 100 F.4th at 866–67 (cleaned up).

Here, Paul has met his burden to establish that the children's habitual residence "immediately before" Leilani's retention in the U.S. was Germany. As outlined above, the children were born in Germany in March 2015 and December 2016 respectively, resided in the same family home in Germany from birth until August 2023, received regular medical care, attended school, participated in extracurricular activities, and spent time with both of their parents, and family and friends. On the instant record, "common sense" plainly dictates that Germany was the children's habitual residence, and Leilani's intent to move the children to the U.S. for a year does not dictate otherwise. *See Monasky*, 589 U.S. at 77 ("What makes a child's residence 'habitual' is . . . some degree of integration by the child in a social and family environment."); *Baz*, 100 F.4th at 868 (confirming that "parental intent alone" does not "dictate a child's habitual residence."); *see also Laing v. Fortini-Laing*, No. 24-CV-10901, 2025 WL 606741, at *9 (N.D.Ill. Feb. 25, 2025) ("Given that [the three and five year old children] . . . had resided together in France for as long as they could remember, the children were likely more at home in France than in Illinois"); *Torres*, 2023 WL 5431352, at *6 (finding Mexico to be the habitual residence where, *inter alia*, the child lived there continuously for three years, attended school, and saw medical providers).

As such, the Court concludes that based on the totality of the circumstances, the children's habitual residence for purposes of the Convention was Germany.

### C. Paul's Custody Rights

Next, the Court turns to whether Paul maintained custodial rights over the children. "A retention is wrongful under the Convention only if it violates the petitioning parent's 'rights of

custody,' which 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Baz*, 100 F.4th at 870, *quoting Abbott*, 560 U.S. at 9. Because the Court found Germany to be the children's habitual residence, it looks to German law to consider whether Paul had custody rights over the children. *Baz*, 100 F.4th at 870 ("A parent's rights of custody are determined by the laws of the country in which the child has his or her habitual residence.") (cleaned up).

Here, Paul asserts—and Leilani does not dispute—that leading up to the retention of the children in the U.S., German law afforded "both parents equal *de jure* custody" of the children, which continues "until a competent court says otherwise." (Dckt. #56 at 5 (citing German Civil Code Sec. 1626 and *Currier v. Currier*, 845 F.Supp. 916, 921 (D.N.H. 1994) ("[U]nder German law, *both* parents retain joint rights of custody until a decree has been entered limiting one parent's rights.")). Moreover, though not dispositive as to Paul's rights at the time of the retention, the German court subsequently entered its January 2024 judgment awarding Paul the right to determine the place of residence of the children. (JX. No. 11). Nothing in that judgment order appears to suggest that Paul did not otherwise maintain custody rights before its entry or at any point leading up to Leilani's retention of the children in the U.S. in August 2023. In fact, it reflects otherwise to the extent that it terminated the parties' "joint parental custody" at least with respect to determining the place of abode. (*Id*. at 387).[5] For these reasons, the Court finds that Paul had custody rights over the children.

---

[5] In his petition, Paul argues—without citation to supporting case law—that this Court must give the German court's January 2024 judgment "full faith and credit" under ICARA, 42 U.S.C. §11603(g). As the Seventh Circuit has explained, under ICARA, "courts must give full faith and credit to the Hague Convention determinations of other American courts, state or federal, but only when those determinations are rendered 'pursuant to the Convention, in an action brought under [ICARA and the Convention].'" *Redmond v. Redmond*, 724 F.3d 729, 741 n.7 (7th Cir. 2013). "This special preclusion rule does not, on its face, affirmatively authorize American courts to apply res judicata principles to the Hague Convention determinations of *foreign* courts; it's an open question whether it *precludes* application of res judicata

17

### D. Paul's Exercise of his Custody Rights

Finally, under the fourth factor, the Court concludes that Paul was exercising his custody rights at the time of Leilani's retention of the children in the U.S. "The standard for finding that a parent was exercising his custody rights is a liberal one." *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012). As such "[a] person who has valid custody rights to a child under the law of the country of the child's habitual residence cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Baz*, 100 F.4th at 871

Here, despite moving to the family home's basement apartment in May 2022, the record demonstrates Paul's continuous communication with Leilani regarding the children's well-being and activities, and semi-regular visits ("at a minimum" every other weekend), including attending their extra-curricular events, taking them on outings, and spending time together in the family home and with Paul's family. Nothing in the record suggests—nor does the Court believe—that Paul ever abandoned or sought to abandon his children, and, as such, he was clearly exercising his custody rights at the time of the retention. *See Baz*, 100 F.4th at 854 (petitioner was exercising custody rights where the evidence showed she "actively sought to maintain regular contact" with the child); *Nolla*, 2024 WL 2976749, at *26 (even in the face of conflicting testimony, petitioner was exercising his custody rights when he testified he saw the child every other weekend).

---

principles to foreign Hague Convention determinations." *Id*. Moreover, while "the decision to extend comity [to a foreign nation's judgment] is within a court's discretion, the answer is not always that straightforward in Hague Convention cases . . . [and] [m]ost Hague Convention cases that have raised questions of comity involve situations where a foreign court had already adjudicated *a related Hague petition*." *Pedersen v. Shriver*, No. 23-CV-13836, 2024 WL 3718189, at *6 (N.D.Ill. Aug. 8, 2024) (emphasis added). Here, Paul does not contend that the German judgment was rendered as a result of a Hague-related petition, nor has he addressed the complex issues raised by his request. Accordingly, the Court declines to give full faith and credit to the German court's January 2024 judgment.

18

For the foregoing reasons, Paul has shown a *prima facie* case of wrongful retention under the Convention and the Court turns to the application of the "well-settled" exception.

### E. The Well-Settled Exception

Again, because Paul did not file his petition within one year of the date of the wrongful retention, the Court must return the children to Germany unless Leilani demonstrates that they are "now settled in [their] new environment." *Lozano*, 572 U.S. at 5. "To discern whether the 'well-settled' exception applies, the court must determine whether a child is 'in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects.'" *Miasik v. Miasik*, No. 09 C 3109, 2009 WL 10714881, at *7 (N.D.Ill. Dec. 16, 2009), *quoting In re Robinson*, 983 F.Supp.1339, 1345 (D. Colo. 1997). "Courts may consider any relevant factor in making this determination," and generally consider (1) the child's living environment, (2) the child's age, (2) the stability and duration of the child's residence in the new environment, (3) whether the child attends school consistently, (4) whether the child has friends and relatives in the new area, (5) the child's participation in extracurricular school activities, and (6) the respondent's employment and financial stability. *Miasik*, 2009 WL 10714881, at *7; *see also de Jesus Joya Rubio v. Alvarez*, 526 F.Supp.3d 1186, 1202 (S.D.Fla. 2021) (enumerating similar factors).

The Court's consideration of these factors supports the finding that Leilani has met her burden of showing that the children are well-settled in the U.S. *See, e.g., de Jesus Joya Rubio*, 526 F.Supp.3d at 1202 (finding 12-year-old child well-settled where, *inter alia*, he was enrolled in school, performing relatively well, lived in a stable home environment, and spent time with family and friends). To begin with, the children, ages nine and ten, have now lived with their mother in their grandparents' home in the Chicagoland area for nearly two years. It is clear

19

(based on the number of family members who attended the hearings) that the children also have a large and supportive extended family living in the area. The children have attended the local school regularly since August 2023. And, although their school records reflect that they may have faced some challenges in certain topics and required additional support (such as continued EL services and a mentoring program for the son), both of their teachers testified without hesitation that they are well-adjusted, fluent in English, and are performing at their expected grade levels. Both children participate in extra-curricular activities and spend time with friends in those activities, at school, and in their neighborhood. Finally, Leilani has worked since shortly after she arrived in the U.S. and there is no indication in the record that she is financially unstable.

## CONCLUSION

For the foregoing reasons, the Court denies Paul's petition for the return of the parties' children to Germany under the Convention. This decision in no way constitutes a finding as to the parties' custodial rights over the children and both parties are encouraged to continue to assert their respective rights in the proceeding pending in the Circuit Court of Lake County.

**DATE: July 7, 2025**

_____
**Jeffrey I. Cummings**
**United States District Court Judge**